# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| TERRY A. BLAIR, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No.   14-0366-CV-W-DW-P |
| | ) | |
| TROY STEELE, | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING THE ISSUANCE OF A CERTIFICATE OF APPEALABILITY

Petitioner, a convicted state prisoner currently confined at the Potosi Correctional Center in Mineral Point, Missouri, has filed *pro se* a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.   Petitioner challenges his 2008 convictions and sentences for six (6) counts of murder in the first degree which were entered in the Circuit Court of Jackson County, Missouri.   The direct appeal of his convictions, *State v. Blair*, 298 S.W.3d 38 (Mo. App. 2009) (Respondent's Exhibit E), and the appeal from denial of his motion for post-conviction relief, *Blair v. State*, 402 S.W.3d 131 (Mo. App. 2013) (Respondent's Exhibit J) were denied.

Petitioner raises six (6) grounds for relief: (1) the evidence was insufficient to find petitioner guilty of all six counts of murder; (2) trial court error in relying on evidence that was not supported by the record; (3) trial court error in failing to suppress petitioner's preliminary statements to police and failing to furnish petitioner with an electronic record of his interrogation recorded by a local television station; (4) ineffective assistance of trial counsel for failing to object to Dr. Young's testimony regarding an autopsy performed by Dr. Gill; (5) ineffective assistance of trial counsel for failing to object to the testimony of Ruby Williams; and (6) ineffective assistance of trial counsel for failing to call petitioner to testify during a suppression hearing.   Respondent contends that all grounds are without merit.

# FACTUAL BACKGROUND

In affirming petitioner's convictions and sentences, the Missouri Court of Appeals set forth the following facts:

> In December 2004, [petitioner] was charged in Jackson County circuit court with eight charges of first-degree murder, § 565.020, RSMo 2000, for the 2004 murders of eight women in Kansas City, Missouri  [Petitioner] was also charged with first-degree assault, § 565.050, RSMo 2000, and three charges of forcible rape, § 566.030, RSMo 2000.

> Prior to trial, the State and [petitioner] reached an agreement in which the State would dismiss two of the murder charges, dismiss the assault and forcible rape charges, and not seek the death penalty.   In exchange, [petitioner] agreed to permit admission of a witness' statement if she could not be located to testify at trial.

> [Petitioner] waived his right to a jury trial, and on March 27, 2008, after a bench trial, the trial court found  [petitioner] guilty of the murder of Sheliah McKenzie, Patricia Wilson, Carmen Hunt, Anna Ewing, Darci Williams, and Claudette Juniel.   On April 24, 2008, the trial court entered judgment and sentenced [petitioner] to six consecutive sentences of life imprisonment without the possibility of parole.

> a.   Summer 2004

> Throughout the summer of 2004, [petitioner] stayed with his mother, who lived at 2449 Prospect, and with his sister, who lived at 1340 West Bluff.   The man living above [petitioner]'s mother often let prostitutes eat, sleep, and shower at his apartment. [Petitioner]'s grandmother lived nearby at 2454 Olive.

> b.   Anonymous 911 Calls

> On September 3, 2004, at approximately 10:39 p.m., an unidentified male made a 911 call from a deactivated cell telephone without a SIM card (meaning no number was attached to identify the telephone making the call) to report a dead body at 29th and Park.   (This body would later be identified as Carmen Hunt).   At trial, a linguistics professor identified the 911 caller as an urban, native-English-speaking, African-American male in the lower-middle to upper working class.

> The caller told the 911 dispatcher that the body was in the back yard at the northeast house on the corner.   When asked how he knew there was a dead body there, he said, "I put it there."   The caller refused to identify himself.   When he was asked a second time how he knew the body was there, the man stated, "Because I put the two on 25th and Montgall, and I put that there." (In context, the caller is referring to the bodies of Sheliah McKenzie and Patricia Wilson).

2

The caller told the dispatcher the body at 29th and Park was in the back yard of an abandoned house on the corner and that it was "all the way to the fence by the alley, buried up under tree branches. It's been there for about two months." The caller said he did not know the victim's name, but knew she was a prostitute.

The caller again confirmed that he killed the other two prostitutes whose bodies were found at 25th and Montgall and then hung up.

On September 4, 2004, at 6:51 p.m., the same unidentified man, using the same cell telephone, called 911. The caller told the 911 dispatcher that he had called the day before to "report bodies" and that he was calling again to report "two more bodies."

The caller stated that one body was at 24th and Prospect "in the alley right next to the gate by the U-Haul place" and was covered by "black vinyl." (this body would later be identified as Darci Williams). The caller stated the other body was at 27th and Olive and covered with brush and pillows. (This body would later be identified as Claudette Juniel). The caller said the victims were prostitutes and that he killed them because they were "scum" and a "disgrace." The caller refused to give his name, but told the dispatcher that the body at 27th and Olive had been there for about six weeks and that the one at 24th and Prospect had been there only a week. The caller told the dispatcher, "you can smell hell." The caller told the dispatcher that he did not know the victims' names, but that he was killing these women because they were prostitutes.

The caller went on to tell the dispatcher that he put the two bodies at 26th and Montgall (McKenzie and Wilson), and when asked if there were other victims, the caller mentioned the body found at 23rd and Prospect (Anne Ewing), but said that "they find [sic] her long time ago."

The cell telephone used to make these two calls, as well as a 911 hang-up call on August 30, 2004, was a T-Mobile cell telephone stolen from a maintenance company. Although the telephone did not have an internal SIM card, all phones have an International Mobile Equipment Identifier and a feature that always allows a cell telephone to dial 911. No further calls were attempted from this cell telephone after it was reported that police were attempting to track the location of the caller.

Officers made "test calls" with a T-Mobile cell telephone from [petitioner]'s mother's apartment and [petitioner]'s sister's duplex in an attempt to determine the location of the 911 caller. The officers' tests showed that the September 3rd call originated from the south of a cell tower at 18th Street and Prospect. [Petitioner]'s mother's apartment was directly south of this tower. The August 30th hang-up call and the September 4th call both originated from the north of a tower located at 3330 Roanoke. [Petitioner]'s sister's duplex at 1340 West Bluff is directly north of this cell-phone tower.

During the September 4, 2004, 911 call, the sounds of children playing and a

3

train horn could be heard in the background. There are two playgrounds within a short distance of [petitioner]'s sister's housing complex, including one just behind her residence. [Petitioner]'s sister's duplex is also located near several sets of railroad tracks. Train records and GPS coordinates show that a train blew its horn at 6:53 p.m. on September 4, 2004 (the 911 call that night started at 6:51), in a location near [petitioner]'s sister's duplex. At trial, a friend of [petitioner]'s testified that it was possible to hear the trains from [petitioner]'s sister's duplex.

c. [Petitioner]'s Arrest

On September 6, 2004, Cherry Chadbourne flagged down police and told them that [petitioner] told her he was going to kill all prostitutes one by one because they were the scum of the earth. Earlier that summer, [petitioner] paid Chadbourne for sex. Chadbourne also told police that [petitioner] had been stalking her and told her what she had been wearing the previous week. [Petitioner] also told Chadbourne he killed his first wife because she had become a prostitute.

On September 10, 2004, [petitioner] was at a friend's house when his picture was featured in a newscast as a person of interest in a string of murders committed along the Prospect corridor. [Petitioner]'s friend pretended she did not recognize him as the person of interest. When [petitioner] left her house, she called the police. [Petitioner] later returned to his friend's house and hid in the garage. Police found [petitioner] between the rear of a car and the back of the garage.

After his arrest, [petitioner] received the *Miranda* warnings and agreed to talk to police. [Petitioner] was shown pictures of five of the victims. [Petitioner] denied having contact with any of the victims or being at any of the locations where the bodies were found.

[Petitioner] would later state that he recognized Darci Williams and that he had seen her ten or eleven days earlier. [Petitioner] denied ever having sex with Williams. [Petitioner] also denied ever having sex with any of the victims or any prostitute except for a woman named "Peaches whom he paid for sex in 2002.

[Petitioner] also denied that he had made the anonymous 911 calls. [Petitioner] told police that on September 3 and 4, 2004, when the calls were made, he helped his mother move out of her apartment and stayed with his sister (thus placing him in the areas from where the 911 calls were made).

*State v. Blair*, 298 S.W. 3d at 40-43.

Before the state court findings may be set aside, a federal court must conclude that the state court's findings of fact lack even fair support in the record. *Marshall v. Lonberger*, 459 U.S. 422, 432 (1983). Credibility determinations are left for the state court to decide. *Graham v. Solem*, 728

4

F.2d 1533, 1540 (8th Cir. en banc), <u>cert</u>. <u>denied</u>, 469 U.S. 842 (1984).  It is petitioner's burden to establish by clear and convincing evidence that the state court findings are erroneous.  28 U.S.C. § 2254(e)(1).[1]  Because the state court's findings of fact have fair support in the record and because petitioner has failed to establish by clear and convincing evidence that the state court findings are erroneous, the Court defers to and adopts those factual conclusions.

## GROUND 1

In Ground 1, petitioner asserts that the trial court erred in finding him guilty.  Petitioner claims that the State's evidence was insufficient to support the finding that petitioner committed all six murders.  Doc. No. 1, p. 6.  The Missouri Court of Appeals considered the sufficiency of the evidence presented at trial.  They began their analysis by determining that the record supported the fact finding that petitioner was the anonymous 911 caller:

> At the outset of this analysis, it is especially helpful to establish that sufficient evidence supports the trial court's finding of fact that [petitioner] was the 911 caller. This is because at trial and oral argument, it was conceded that one person killed all six victims.  In its judgment, the trial court observed this when it noted, "[a]s everyone involved has stated, identify the caller because he must also be the killer."  In this regard, however, it is important to remember that this factual determination was merely one factual finding that was used cumulatively with all the other evidence to prove guilt beyond a reasonable doubt.

> At trial, a linguistics professor identified the 911 caller as an urban, native-English-speaking, African-American male in the lower-middle to upper working class.  [Petitioner] fits this description.

> Test calls made by police establish that the caller and [petitioner] were in the same vicinity when the calls were made.  The August 30th and September 4th calls originated from a cell phone tower located at 3330 Roanoke.  This tower is directly south of [petitioner]'s sister's duplex at 1340 West Bluff.  Out of seven test calls made

---

[1]In a proceeding instituted by an application for writ of habeas corpus by a person in custody pursuant to a judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Case 4:14-cv-00366-DW   Document 20   Filed 11/03/14   Page 5 of 18

from [petitioner]'s sister's duplex, three calls originated from the Roanoke cell tower and reported the identical longitude and latitude as the anonymous 911 calls.

Other evidence places the calls in the vicinity of [petitioner]'s sister's duplex. There are two children's playgrounds within a short distance of the duplex, and the sound of children playing can be heard in the background of the call. The duplex is also near train tracks. A train horn can be heard in the call. Evidence from a train's onboard computer and GPS showed that it blew its horn during the call and while it was near the duplex. One of [petitioner]'s friends testified that trains could be heard at the duplex.

The September 3rd call originated from a tower at 18th and Prospect. [Petitioner]'s mother's apartment is directly south of this tower at 2449 Prospect. Nine test calls were made in front of [petitioner]'s mother's apartment, five originated from the cell tower at 18th and Prospect and one call reported the identical latitude and longitude as the anonymous 911 call made on September 3rd.

[Petitioner] admitted to being at both his mother's and sister's residence on September 3rd and 4th, telling police that he helped his mother move out of her apartment on 2449 Prospect and that he stayed at his sister's duplex at 1340 West Bluff. Thus, [petitioner] was in the vicinity where the 911 calls were made.

Finally, [petitioner] made comments very similar to the 911 caller. At trial, Cherry Chadbourne testified that [petitioner] told her he killed his first wife because she had become a prostitute and that he was going to kill all prostitutes because they were scum of the earth. The 911 caller told the dispatcher that he killed the prostitutes because "they are scum" and "a disgrace." The trial court found this to be "stunningly identical."

The trial court's conclusion that [petitioner] was the anonymous caller is supported by the record. That [petitioner] was the 911 caller is important; [petitioner]'s identity as the 911 caller, in light of the facts that [petitioner] identified the location of all six bodies and the concession at trial and oral argument that one person killed all six victims, is significant evidence supporting the sufficiency of his convictions.

*State v. Blair,* 298 S.W.3d at 43-44.

The appellate court went on to find that there was sufficient evidence of petitioner's responsibility for each of the six murders. In regard to Sheliah McKenzie, the appellate court held:

McKenzie's mother told police she last saw her daughter at about 11 a.m. on September 2, 2004. McKenzie's body was found that same day. A Kansas City police officer was investigating a foul odor near 26th and Montgall. After further

6

investigation, the officer went inside a detached garage at 2609 Montgall and found McKenzie's body under a tarp and stacked on top of the body of Patricia Wilson.

McKenzie's body was nude from the ankles to the clavicle with a dress and t-shirt bunched about her neck and shoulders. McKenzie's neck had been broken, and there was evidence she had been strangled. Officers found McKenzie's blood on the carpet inside of a house under renovation at 2617 Montgall.

A test of material taken from under McKenzie's fingernails revealed male DNA. Semen found on both of McKenzie's thighs was tested and proven to be [petitioner]'s DNA. Rectal and vaginal swabs also contained [petitioner]'s DNA. An acid phosphate test showed that [petitioner] ejaculated into McKenzie within one day of when her body was found. When police questioned [petitioner], he denied ever knowing or having sex with McKenzie.

At trial, the court heard testimony that gravity will cause semen to leak from the vaginal vault and testimony that clothing rubbing against the skin would cause DNA to be sloughed off of a person's skin. Based on that testimony and the DNA evidence found on McKenzie, the court determined that McKenzie's last conscious act was intercourse with [petitioner].

The court noted that because of the semen on her body, "it was fair to assume" that if McKenzie's murder was not during or immediately after intercourse, she would have urinated and cleaned herself, thus partially or completely eliminating the semen. The court also determined that if McKenzie had been able to walk around after intercourse, the semen on her thighs would have been sloughed off. Instead, the court found McKenzie's body was killed in the abandoned house and that when [petitioner] dragged her body into the garage semen "easily could have leaked out and onto her thighs in transit."

The DNA evidence, however, is not the only evidence supporting [petitioner]'s conviction for the first-degree murder of McKenzie. The court also noted [petitioner]'s denial of having ever known or having sex with McKenzie. [Petitioner]'s denial evidenced a consciousness of guilt. *State v. Perry,* 275 S.W.3d 237, 249 (Mo. bane 2009) (A finder of fact may reasonably infer lying as consciousness of guilt). Considering that [petitioner] had sex with McKenzie approximately ten days before his interview with police, his denying that he knew her or ever had sex with her is especially compelling evidence of guilt. *Compare State v. Calhoun*, 259 S.W.3d 53, 55-57 (Mo. App. 2008) (The defendant's denials fourteen years later of having sex with the victim despite the presence of semen in her evidenced a consciousness of guilt).

[Petitioner] also showed a consciousness of guilt when he hid from the police after seeing himself described as a person of interest in the case. *State v. Kalagian,* 833 S.W.2d 431, 434 (Mo. App. 1992) ("Evidence that a defendant avoided arrest is admissible as indicating a consciousness of guilt").

*State v. Blair*, 298 S.W. 3d at 45.

As to the remaining victims, the appellate court stated:

As detailed above, on September 2, 2004, police found the body of Sheliah McKenzie hidden under a tarp in a garage at 2609 Montgall. Patricia Wilson's body was hidden underneath McKenzie. Wilson's body was badly decomposed, and her death was ruled a homicide because her body had been concealed. Wilson's blood was found smeared on the kitchen floor in a house at 2617 Montgall (this is the same house where McKenzie's blood was found on the carpet).

[Petitioner]'s identity as Wilson's murderer is established by the fact that he dumped McKenzie's body on top of Wilson's badly decomposed body. Wilson's body was concealed, and the fact that he knew where her body was and stored McKenzie's body on top of Wilson's body indicates he knew where he could hide McKenzie's body because he murdered Wilson and hid her body in the same location.

[Petitioner] also identified himself as Wilson's killer in the 911 call. After taking credit for the body at 29th and Park, [petitioner] took credit for murdering the two bodies found on Montgall:

[Dispatcher]: How do you know the body's there?
[Petitioner]: Because I put the two on 25th and Montgall,
and I put that there.

[Petitioner]'s admission is direct evidence of his guilt. *Wilbon,* 874 S.W.2d at 542. [Petitioner]'s choice to hide McKenzie on top of Wilson proves his knowledge and corroborates his conviction. *Miller,* 139 S.W.3d at 637.

[Petitioner] also showed a consciousness of guilt that he murdered Wilson when he hid from the police. *Kalagian,* 833 S.W.2d at 434.

**f. Sufficient evidence supports [petitioner]'s conviction for the murder of Anna Ewing**

On July 14, 2004, police found Anna Ewing's body at 2608 East 23rd Street, an area known for prostitution. Ewing's body was found near a raised concrete pad in the backyard and was covered by brush. Other than a bra that was still partially on her body and a knitted garment around her neck, Ewing was completely nude. Ewing's legs and feet were muddy. She had abrasions on her arm and bruises on her shoulder. She had an area of bleeding above her right eyebrow and bleeding in the white of her eye.

An amylase test for the presence of saliva was performed on Ewing's left breast. A single allele found within the DNA included [petitioner] as a possible

contributor. DNA was extracted from blood under Ewing's fingernails and test results included Ewing as a major contributor and [petitioner] as a possible minor contributor. The DNA profile contained in the sample occurred in one in 1,400 African-Americans. [Petitioner] is an African-American.

[Petitioner] admitted to killing Ewing during the September 4th call:

[Dispatcher]: Can you tell me if you've buried any
more?
[Petitioner]: It was one on 23rd and Prospect, they find
[sic] her long time ago.
[Dispatcher]: Yeah, we, we ... The one on 23rd and
Prospect, you did that one, too?
[Petitioner]: Yeah, and I have more.

This admission by petitioner supports his conviction for the first-degree murder of Ewing. *Wilbon,* 874 S.W.2d at 542. Furthermore, the DNA evidence here corroborates his admission. *Miller,* 139 S.W.3d at 637; *see also State v. Rockett,* 87 S.W.2d 398, 405 (Mo. App. 2002) (holding that a jury could rely on DNA evidence that did not result in identification to a scientific certainty as substantial evidence of the defendant's identity).

[Petitioner] also showed a consciousness of guilt that he murdered Ewing when he hid from the police. *Kalagian,* 833 S.W.2d at 434.

## g. Sufficient evidence supports [petitioner]'s conviction for the murder of Darci Williams

During the September 4th 911 call, [petitioner] told police they would find a body at 24th and Prospect, "It's one on 24th and Prospect between 24th Street and, 24th and Terrace. It's in the alley right next to the gate by the U-Haul place." At 7:30 p.m. on September 4, 2004, police found the body of Darci Williams lying in some brush outside a fenced parking lot. Photographs of the crime scene show two U- Haul advertising banners. The body was covered by roofing tar paper and was not immediately visible. Police officers had to cut the fence to get to the body, which was badly decomposed. A black knit shirt was around Williams' neck.

Williams' mother testified at trial that she met with her every week on Wednesday. The last time Williams' mother saw her was between 3:30 p.m. and 4 p.m. on August 25, 2004, when she dropped her off at 25th and Prospect. When Williams exited her mother's car, she crossed the street and approached three men. One of those men was [petitioner]. Williams' mother did not hear from her on the following Wednesday and never talked to her again. Although the cause of death was undetermined, the medical examiner ruled that Williams' death was a homicide because the body was concealed at the scene.

9

[Petitioner]'s admission concerning the location of Williams' body supports his conviction for the first-degree murder of Williams. *Wilbon,* 874 S.W.2d at 542. [Petitioner] also showed a consciousness of guilt that he murdered Williams when he hid from the police. *Kalagian,* 833 S.W.2d at 434.

**h. Sufficient evidence supports [petitioner]'s conviction for the murder of Carmen Hunt**

On September 4, 2004, police found the skeletal remains of Carmen Hunt behind an apartment building at 2905 Park. Her body was lying in an overgrown area and had been covered with carpet and brush. A medical examiner stated that Hunt had been dead for at least a week when she was found. Hunt's death was ruled a homicide because her body had been concealed.

During the September 3rd 911 call, [petitioner] admitted he killed Hunt:

[Petitioner]: I want to report a dead body
[Dispatcher]: Where?
[Petitioner]: On 29th and Park.
[Dispatcher]: 29th and Park?
[Petitioner]: In the back yard at the northeast house on the corner.
[Dispatcher]: Northeast house on the corner?
[Petitioner]: Yeah.
[Dispatcher]: How do you [know] it's a dead body there?
[Petitioner]: I, I put it there.
***
[Dispatcher]: How'd you kill the lady on, at 29th and Park? What'd you do to her?
[Petitioner]: Killed them (inaudible).

[Petitioner]'s confession supports his conviction for the first-degree murder of Hunt. *Wilbon*, 874 S.W. 2d at 542. [Petitioner] also showed a consciousness of guilt that he murdered Hunt when he hid from the police. *Kalagian,* 833 S.W.2d at 434.

**i. Sufficient evidence supports [petitioner]'s conviction for the murder of Claudette Juniel**

On September 4, 2004, police found the skeletal remains of Claudette Juniel in a vacant lot at 2745 Olive. Juniel's body was nude and had been covered with couch cushions, sticks, and a tire. Police testified they would not have found the body if they had not been given directions by the 911 caller. A shirt was tied around the victim's neck. Juniel's death was ruled a homicide because her body had been concealed.

During the September 4th 911 call, [petitioner] admitted he killed Juniel:

[Petitioner]: I want to report two more bodies today.
***

10

[Petitioner]: The other body is on 27th and Olive. The southeast corner house in the back yard in the yard next to the back yard which is a vacant lot.
***
[Dispatcher]: Who are these people that you buried, sir?
[Petitioner]: These people are prostitutes.
[Dispatcher]: Okay, why did you kill these prostitutes?
[Petitioner]: Because they are scum.
[Dispatcher]: They're what?
[Petitioner]: Scum. They're disgrace, they're a disgrace.

      [Petitioner]'s confession supports his conviction for the first-degree murder of Juniel. *Wilbon,* 874 S.W.2d at 542. Petitioner also showed a consciousness of guilt that he murdered Juniel when he hid from the police. *Kalagian,* 833 S.W.2d at 434.

*State v. Blair*, 298 S.W. 3d at 47-50.

The Missouri Court of Appeals' resolution of petitioner's claim that there was sufficient evidence to convict him of all six counts of murder was not based on an unreasonable determination of the facts or on a misapplication of federal constitutional law. *See* 28 U.S.C. 2254(d)(1) and (2); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (constitutional standard for judging sufficiency of the evidence in criminal trials is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). "In applying this standard, '[t]he scope of our review for a collateral challenge to the sufficiency of the state's evidence is extremely limited. . . We must presume that the trier of fact resolved all conflicting inferences in the record in favor of the state, and we must defer to that conclusion." *Sexton v. Kemna*, 278 F.3d 808, 814 (8th Cir. 2002) (citing *Miller v. Leapley*, 34 F.3d 582, 585 (8th Cir. 1994)), *cert. denied*, 537 U.S. 886 (2002).

In the present case, a trier of fact could have concluded beyond a reasonable doubt, based on the DNA evidence, the GPS location of the 911 caller, the location of petitioner's mother's and sister's residences, the statements of Ms. Chadbourne, the information provided on the location of the bodies, and other evidence, that the petitioner committed the six counts of first-degree murder. Although it is

11

possible to conclude from the evidence that someone other than the petitioner committed the crimes, this Court may not conduct its own assessment of the evidence. *United States v. Anderson*, 78 F.3d 420, 422 (8th Cir. 1996) ( "[t]he evidence need not exclude every reasonable hypothesis of innocence. . . we may not disturb the conviction if the evidence rationally supports two conflicting hypotheses."). The appellate court's ruling did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *see* U.S.C. § 2254(d)(1) and (2). Ground 1 will be denied.

## **GROUND 2**

In Ground 2, petitioner claims that the trial court erred by making inferences about the evidence based on information not in the record. Specifically, petitioner contends that the court erred by "rel[ying] heavily on its own apparent expertise and opinions concerning how a woman's clothing, bodily functions and personal care would affect semen in her vagina and on her person." Doc. No. 1, p. 20. Petitioner asserts that this violated his due process rights. Doc. No. 1, p. 20. The Missouri Court of Appeals considered Ground 2 and ruled on the merits:

> The responsibilities of fact finders include weighing the evidence presented, judging the credibility of evidence, and making reasonable inferences from the evidence presented. These responsibilities substantiate the rationale that an appellate court is compelled to consider evidence and all reasonable inferences in a light most favorable to the conviction when considering whether there is sufficient evidence from which a trier of fact could have reasonably found each element of a crime beyond a reasonable doubt. *State v. Gilbert,* 103 S.W.3d 743, 749 (Mo. banc 2003).

> The court's inferences were based on evidence supported by the record. The State's expert witness, the quality assurance director at the Kansas City police department's crime laboratory, testified that there is a well documented dissipation rate for semen in the vaginal cavity. The result of the acid phosphate test (a test that looks for an enzyme found in semen) will diminish in intensity as semen dissipates. This

Case 4:14-cv-00366-DW   Document 20   Filed 11/03/14   Page 12 of 18

can be due to "normal dissipation from the vaginal vault itself or just decomposition of the acid phosphate enzyme as it sits in the vaginal vault."

The director also testified that movement of the body causes dissipation. Once a person stands up, "gravity takes effect, and the fluid will move according to gravity." The director testified that a pair of jeans found near Anna Ewing's body showed that Ewing had put the jeans on after intercourse with another man.

During cross-examination, the director testified that clothing rubbing against the skin would cause DNA to be sloughed off of a person's skin. Thus, the record contains evidence that semen will dissipate from the vaginal vault after being deposited and that its presence in or on a body can be affected by gravity or clothing. This evidence refutes [petitioner]'s contention that the court relied on evidence or inferences from the evidence not supported by the record.

[Petitioner] also argues that under *Calhoun,* 259 S.W.3d at 53, the trial court, as the fact-finder, was prohibited from making inferences concerning how gravity and everyday activities affect semen.

In *Calhoun,* the State's expert witness testified that a victim was flat on her back for at least fifteen minutes after intercourse because gravity had caused semen to flow up her buttocks. *!d.* at 57-58. The defendant alleged that the court should have *sua sponte* struck the witness' testimony because the witness was in no better position than the jury to form an opinion as to the effect of gravity on semen. *!d.* at 58. This Court found it was not plain error to admit the testimony because it "is technically correct that an average person understands gravity, it is not evident or clear that an average person would be able to apply that generalized understanding to the facts of Calhoun's case and draw the conclusions that Olsson did. The circuit court did not plainly err in admitting Olsson's testimony." *!d.* at 59.

[Petitioner] argues that under *Calhoun,* the court's inferences concerning gravity and its effect on semen required expert testimony. *Calhoun* does not suggest that testimony from an expert witness is necessary before the State can prove that gravity will cause semen to run out of the vaginal vault, that clothing would wipe off a woman's upper thigh area, or that semen can be dissipated by urinating and wiping afterwards. Contained in [petitioner]'s argument is the implicit allegation that the trial court was not capable of applying expert testimony to the facts of the case and forming conclusions. Here, the court's inferences were the result of the application of testimony to the facts of the case.

*State v. Blair*, 298 S.W. 3d at 46-47.

There was sufficient evidence in the record for the trial court to believe that movement, clothing, and activity would have an effect on the presence of semen. Though petitioner disagrees

with the conclusion made by the trial court, he fails to show that the court's reliance on the evidence resulted in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *see* U.S.C. § 2254(d)(1) and (2). As such, Ground 2 will be denied.

## **GROUND 3**

In Ground 3, petitioner claims that the trial court erred in failing to suppress petitioner's preliminary statements to police. Petitioner contends that the admission of his pretrial statement violated his right to due process because the police did not record the statement. The Missouri Court of Appeals found that there was no Supreme Court precedent that required the police to record a pretrial statement. *State v. Blair*, 298 S.W. 3d at 50-52. Accordingly, petitioner does not demonstrate that the state court unreasonably applied Supreme Court precedents, a prerequisite to relief under 28 U.S.C. § 2254(d).

Petitioner also complains that a television show recorded some of his interrogation and that the footage was not made available to the parties. The police, however, never received a copy of the recording, and the recording was not preserved by the production company. *State v. Blair*, 298 S.W. 3d at 50. Because the State did not have a copy of the recording, there was nothing for the State to disclose to petitioner. Petitioner additionally fails to show Supreme Court precedent that dictates a grant of relief in this situation.

As the Missouri Court of Appeals decision on Ground 3 did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable

14

determination of the facts in light of the evidence presented in the State court proceeding," *see* U.S.C. § 2254(d)(1) and (2), Ground 3 will be denied.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner's Ground 4, 5, and 6 are each claims of ineffective assistance of trial counsel. Petitioner claims that he received ineffective assistance of trial counsel because (Ground 4) trial counsel stipulated that Dr. Young could testify about the autopsies actually performed by Dr. Gill; (Ground 5) trial counsel did not object to the testimony of Ruby Williams, who identified petitioner as the person she saw Darci Williams meet the last time that Ruby saw Darci alive; and (Ground 6) trial counsel did not call petitioner to testify at the motion to suppress statement hearing.

In order for petitioner to successfully assert a claim for ineffective assistance of trial counsel, petitioner must demonstrate that his attorney's performance "fell below an objective standard of reasonableness" and that "the deficient performance" actually prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). This Court, moreover, may not grant habeas relief unless the state appellate court's decision "was contrary to, or an unreasonable application of, the standard articulated by the [United States] Supreme Court in *Strickland*." *Owens v. Dormire*, 198 F.3d 679, 681 (8th Cir. 1999), *cert. denied*, 530 U.S. 1265 (2000).

"A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 689). Petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

The Missouri Court of Appeals, in affirming the denial of petitioner's 29.15 post-conviction motion, addressed the ineffective assistance of trial counsel claims:

15

Prior to trial, [petitioner]'s counsel Cynthia Dryden ("Trial Counsel Dryden") and David Kenyon ("Trial Counsel Kenyon") entered into a stipulation with the State that Dr. Thomas Young could testify regarding the autopsies performed by Dr. Thomas Gill. An autopsy was performed on each of the six victims. The cause of death for five of the six victims was undetermined, but the deaths were ruled homicides because the bodies had been concealed. Dr. Young performed autopsies on three of the six victims while Dr. Gill performed autopsies on the other three victims. The stipulation was made with the understanding that if Dr. Young reached a different conclusion than Dr. Gill, such conclusions would be disclosed prior to his testimony.

Additionally, [petitioner]'s trial counsel sought to suppress statements [petitioner] made to the police on the basis of *Miranda* violations as well as any testimony regarding any out-of-court or in-court identification of [petitioner]. In particular, the defense sought to prevent Ruby Irene Williams, mother of victim Darci Williams ("Darci"), from testifying and identifying [petitioner] as the last person she saw Darci with prior to Darci's disappearance. [Petitioner] did not testify at the suppression hearing held regarding these issues. Following the hearing, the trial court overruled [petitioner]'s motion to suppress his statements to police but took the identification issue under advisement. Ultimately, the trial court denied [petitioner]'s attempts to suppress Ruby Williams's testimony identifying [petitioner] with Darci prior to her disappearance.

\*\*\*

On February 10, 2011, the motion court conducted an evidentiary hearing at which Trial Counsel Kenyon, Trial Counsel Dryden, and [petitioner] testified. Trial Counsel Kenyon testified that he could have required the State to call Dr. Gill to testify regarding the three autopsies he performed, but there was no tactical advantage in doing so because Dr. Young reached the same conclusions as Dr. Gill – mainly that the cause of death of those three victims was undetermined. He further explained that he considered calling [petitioner] to testify at the suppression hearing but ultimately advised [petitioner] not to testify. He explained, however, that even though [petitioner] followed his and Trial Counsel Dryden's advice not to testify, [petitioner] knew it was his decision whether to testify at the hearing.

Trial Counsel Dryden testified that she could have made a hearsay objection to Dr. Young testifying about the autopsies performed by Dr. Gill. She explained, however, that the cause of death was not at issue in the case and that it was actually beneficial for the defense that the medical examiners agreed that the cause of death of five of the victims could not be determined. She further testified that [petitioner] made the ultimate decision as to whether to testify at the suppression hearing. Trial Counsel Dryden also explained that she filed an oral motion to suppress Ruby Williams's identification of [petitioner] but that she did not believe she objected to Ruby William's in-court identification of [petitioner].

16

***

On November 22, 2011, the motion court entered its judgment denying [petitioner]'s motion for post-conviction relief. In doing so, the motion court found that [petitioner] failed to state what alleged prejudice resulted from his trial counsel entering into an agreement that permitted Dr. Young to testify about the autopsies Dr. Gill performed on three of the victims. The motion court further concluded that Dr. Young's testimony regarding Dr. Gill's autopsies was admissible and that trial counsel's decision to have Dr. Young testify as opposed to Dr. Gill was a matter of trial strategy. The motion court also concluded that [petitioner] failed to present any evidence that trial counsel's failure to object to Ruby William's identification of [petitioner] at trial "was anything short of sound trial strategy" and, likewise, failed to identify how he was prejudiced by trial counsel not objecting to such evidence. Additionally, the motion court opined that [petitioner]'s trial counsel was not ineffective for failing to call him as a witness at the suppression hearing because the evidence established that [petitioner] knew it was his decision whether to testify and he chose to follow his trial counsel's advice not to testify.

*Blair v. State*, 402 S.W. 3d at 133-135 (internal footnotes omitted).

The decision of the Missouri Court of Appeals is reasonable and therefore is entitled to deference under § 2254(d). Trial counsels' decisions to permit Dr. Young to testify about Dr. Gills' autopsies, not to object to the testimony of Ruby Williams, and to advise petitioner not to testify at the suppression hearing were all matters of strategy. In *Blackmon v. White*, 825 F.2d 1263, 1265 (8th Cir. 1987), the United States Court of Appeals for the Eighth Circuit stated that "the courts must resist the temptation to second-guess a lawyer's trial strategy; the lawyer makes choices based on the law as it appears at the time, the facts as disclosed . . . and his best judgment as to the attitudes and sympathies of judge and jury." *See also Shaw v. U.S.*, 24 F.3d 1040, 1042 (8th Cir. 1994) (trial counsel's reasonable trial strategies cannot constitute ineffective assistance, even if they are unsuccessful); *Henderson v. Norris*, 118 F.3d 1283, 1287-88 (8th Cir. 1997) (matters of trial strategy presumed correct), *cert. denied*, 522 U.S. 1129 (1998).

Because the state courts' determinations did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *see* 28 U.S.C. §2254(d)(1) and (2), Grounds 4, 5, and 6 will be denied.

## A CERTIFICATE OF APPEALABILITY WILL BE DENIED

Under 28 U.S.C. § 2253(c), the Court may issue a certificate of appealability only "where a petitioner has made a substantial showing of the denial of a constitutional right." To satisfy this standard, a petitioner must show that a "reasonable jurist" would find the district court ruling on the constitutional claim(s) "debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 276 (2004). Because petitioner has not met this standard, a certificate of appealability will be denied. *See* 28 U.S.C. § 2254, Rule 11(a).

Accordingly, it is **ORDERED** that:

(1) the petition for writ of habeas corpus is denied;

(2) the issuance of a certificate of appealability is denied; and

(3) this case is dismissed with prejudice.


        _/s/ Dean Whipple_____
        DEAN WHIPPLE
        UNITED STATES DISTRICT JUDGE

Kansas City, Missouri,

Dated: November 3, 2014.

Case 4:14-cv-00366-DW   Document 20   Filed 11/03/14   Page 18 of 18